UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SAKELIA PERRY, a minor,                 )
by her mother, Lashon Perry,  et al.,   )
                                        )
              Plaintiffs,               )
                                        )
         v.                             )   Civil Action No. 04-0150 (RWR)
                                        )
FREDERICK INVESTMENT CORP., et al.      )
                                        )
              Defendants.               )
_____ )

MEMORANDUM OPINION

In this lead-paint poisoning tort case, George Frederick Marshall and Jenny Petri, two of

the three defendants, seek summary judgment.[1]  For the reasons stated herein, this motion will be

DENIED.

**I.  BACKGROUND**

**A.     Facts**

Viewing the record in the light most favorable to the plaintiffs, the following material

facts are either undisputed or must be assumed to be true for purposes of evaluating the pending

motion for summary judgment:

1.      From December 1993 to March 1995, Sakelia Perry, then an infant, lived with her

mother, Lashon Perry, in an apartment at 1150 Clifton Street, N.W., in Washington, D.C. (the

"Clifton Street Apartment").

---

[1]On December 22, 2006, Judge Richard W. Roberts transferred this motion [dkt #29] to
the undersigned.

2.      While living at the Clifton Street Apartment, Sakelia was exposed to lead paint.

3.       In 1995, after a visit to Children's Hospital, Lashon learned that Sakelia was suffering from lead paint poisoning.   Subsequent tests showed that the paint on the windowsills of the Clifton Street Apartment contained excessive levels of lead.

4.      At all relevant times, defendant Frederick Investment Corporation was the general, and controlling, partner of Clifton Terrace Associates, Ltd. ("Associates"), a general partnership that held legal title to the Clifton Street Apartments

5.      Defendant George Frederick Marshall was the President and owned all of the stock of Frederick Investment Corporation.  He exercised total control over its operations; indeed, he was the only "real" person behind it.

6.      Defendant Jenny Petri was the Vice-President of Frederick Investment Corporation, but her responsibilities there were "extremely minimal."  Marshall Aff. ¶ 3.

7.      In his capacity as the President of Frederick Investment Corporation, Marshall hired One Management Corporation to manage the Clifton Street Apartment Building.

8.      Marshall was the President of One Management and held 60% of its stock.

9.      Petri was the Vice-President and General Manager of One Management; she owned 40% of its stock.

10.      Marshall was not involved in the daily operations of One Management.  He "delegated" all of his responsibilities to Petri.  Marshall Dep. at 20.   Petri "ran the company." Petri Dep. at 29.

11.      Marshall did not monitor Petri's day-to-day activities because "he had great confidence in her and . . . upon her ability to handle her job.  Marshall Dep. Tr. at 21.

2

12.     Marshall believed that One Management had a policy of inspecting for peeling or chipped paint.  However, he did not know whether that ever occurred.

13.     Marshall did not know what the District of Columbia Housing Code required or whether those requirements had been met.

14.     When Petri took the job as General Manager of One Management, she had no prior property management experience.  Petri Dep. at 30.   She assumed that  One Management already had property management policies in place, and that those policies included inspecting for peeling or chipped paint.  She also assumed that the property management policies were being overseen by the on-site property managers, who were directly responsible for on-site maintenance, overseeing any on-site maintenance staff, and inspecting the apartments.  *Id.* at 29, 30.  However, Petri never actually confirmed that policies existed, learned what they were or checked with the on-site property managers to see if they were being followed.  *Id.* at 30.

15.     Petri believed that there was a policy of inspecting apartments three to four times per year, but she cannot confirm that any such policy existed or that such inspections occurred. *Id*. at 21, 22.

16.     Petri knew that the on-site staff did painting and paint repair work.  She "expected" them to repair peeling paint, but she had no procedure for checking that such repairs actually happened.  *Id*. at 33, 36.

17.     Petri was ignorant about the requirements of the D.C. Housing Code (indeed, it is unclear whether she even knew such a Code existed).  *Id*. at 34-35.  She assumed that the on-site property manager would both know what it required and comply with it.  *Id*. at 34-35.

18.     Petri was not familiar with any Housing and Urban Development regulations that

3

might have applied.[2]  *Id*. at 38-39.

19.     Petri (on behalf of One Management) did visit the Clifton Street Apartment Building on a number of occasions (more than once, less than 25 times) to tour the site, meet with officials from Housing and Urban Development, and/or meet with the on-site staff.  *Id*. at 36-37.  She occasionally went into individual apartments, but she does not recall going into the plaintiffs' apartment.  *Id*. at 37.

20.     Essentially, despite her position as the general manager of One Management, Petri made no effort to learn anything about the underlying business of property management, had no direct involvement in the practices or policies governing the day-to-day operations and management of the Clifton Street Apartment Building, and exercised little to no oversight of its on-site personnel.

21.     An uncontroverted affidavit by Lashon Perry, Sakelia's mother, avers that during the time in question "the landlord" knew that a child of eight years or younger lived in the Clifton Terrace Apartment.  Affidavit of Lashon Perry ¶ 8.  At this summary judgment stage, the non-moving plaintiffs are entitled to the benefit of all inferences, including that "landlord" as viewed by Lashon included Marshall and Petri, and that admissible trial evidence would persuade a jury each knew that an eight year old or younger child lived in the contaminated apartment.  **B.**

   **Procedural History**

   On December 23, 2003, Sakelia, who was still an minor, and Lashon, filed the pending complaint against Frederick Investment Corporation, Marshall,  individually and as an officer of

---

[2]Clifton Terrace Associates acquired the property at 1350 Clifton Street from the Department of Housing and Urban Development in 1983.

Frederick Investment Corporation, and Petri, individually and as an officer of Frederick

Investment Corporation, alleging that while living with her mother in the Clifton Street

Apartment, Sakelia suffered lead poisoning resulting in severe pain and permanent, severely

handicapping injury.  The complaint alleges that each defendant negligently failed to eradicate

the lead paint from the Apartment, is strictly liable for leasing it in a grossly defective and

unreasonably dangerous condition, violated the District of Columbia Consumer Protection

Procedures Act, D.C. Code § 28-3901 et seq. by misrepresenting that the apartment was in a

condition compliant with the District of Columbia Housing Regulations, is liable for punitive

damages, and is liable for loss of services of a minor child.  Without contesting the potential

liability of Frederick Investment Corporation, Marshall and Petri contend that the undisputed

facts entitled them to summary judgment.[3]

## II. DISCUSSION

Marshall and Petri's contention that they are entitled to summary judgment on all claims

against them has three components.  First, they argue that the only possible basis for imposing

individual liability on them would be as officers of Frederick Investment Corporation because "it

is undisputed the neither . . . were the legal owners of the Clifton Terrace Apartment complex."

Memorandum in Support of Defendants George Marshall and Jenny Petri's Motion for Summary

Judgment (Sept. 6, 2005) [dkt. #29-4] ("Defs. Mem.") at 7.  Second, they argue that they cannot

be held liable "as officers" of Frederick Investment Corporation for any of the claims that "sound

---

[3]Frederick Investment Corporation did not file any dispositive motions.

in tort" – negligence, violation of the Consumer Protection Procedures Act,[4] strict

liability/negligence per se, and loss of services of a minor child[5] – because the undisputed facts

establish that they did not "meaningfully participate" in the Corporation's allegedly tortious

conduct.  Third, they argue that they cannot be held liable for punitive damages because "[t]here

are no actual facts that would even remotely support the egregious type of conduct required to

make out a prima facie case for punitive damages."  Defs. Mem. at 13.

## A.     Is There a Basis for Imposing Individual Liability on Marshall and Petri Other Than As Officers of Frederick Investment Corporation?

Marshall and Petri argue that because they are not the "legal owners" of the Clifton Street

Apartment "the only basis for individual liability against [them] . . . is as officers of Defendant

Frederick Investment Corporation."  Defs. Mem. at 7.   They cite no legal authority for this

proposition.  Rather, they point to the allegations in the complaint that, they maintain, are the

"only allegations in the Complaint regarding the basis for imposing individual liability on

[them]."  *Id.*  Those two allegations, made against both Marshall and Petri, are that each (1)

---

[4]Several decisions of the Court of Appeals for the District of Columbia suggest that the version of the Act in effect at the time the plaintiffs' claims arose does not apply to claims seeking damages for personal injuries of a tortious nature arising out of a landlord-tenant relationship.  S*ee Childs v. Purll*, 882 A.2d 227, 237 (D.C. 2005), *Parker v. Martin*, 905 A.2d 756, 763-64 (D.C. 2006).  As the defendants do not make this argument in the pending summary judgment motion, however, the Court will not consider it at this time.

[5]A recent decision of the Court of Appeals for the District of Columbia suggests that District of Columbia law does not recognize a claim for loss of services of a minor child.  *See Parker*, 905 A.2d at 764 (holding that the trial court's "did not err" in holding that "the law of the District of Columbia squarely prohibits any cause of action for loss of 'services' of a minor child. *District of Columbia v. Howell*, 607 A.2d 501, 506 (D.C.1992); *see also District of Columbia v. Hawkins*, 782 A.2d 293, 303 (D.C. 2001).").  As the defendants do not make this argument in the pending summary judgment motion, however, the Court will not consider it at this time.

6

"*owned* and exclusively possessed and controlled, by the use of agents, servants or employees, a dwelling house erected on a lot of ground known as 1350 Clifton Street, N.W., in the District of Columbia, which [each] either individually or by agents, servants, or employees, managed, supervised, maintained, and rented to tenants"; and (2) "alternatively, if sued in the capacity of a present or former corporate officer or director of a corporation which owned the said property, did personally participate in, inspire and/or induce the tortious acts or omissions complained of herein." Compl. ¶¶ 44, 45, 86, 87 (emphasis added). The first of these allegations, they argue, is false because "it is undisputed that neither George Marshall nor Jenny Petri were the legal owners of the Clifton Terrace Apartment complex." Defs. Mem. at 7. Accordingly, they argue, the only basis for imposing individual liability on Marshall or Petri must stem from the second allegation, that is, as officers of defendant Frederick Investment Corporation. *Id.*

The plaintiffs do not dispute that neither Marshall nor Petri is the "legal owner" of the Clifton Street Apartment Building. Nor have they directly responded to the defendants' argument that this undisputed fact means that the only basis for imposing individual liability on Marshall and Petri is as officers of Frederick Investment Corporation. Nonetheless, liability of Marshall and Petri as officers of Frederick Investment Corporation is not the only basis for a judgment against each. The underlying premise of the defendants' argument is that in order for an individual to be liable for Sakelia's alleged lead-paint poisoning – under any of the legal theories put forth in the complaint – he or she must either be the "legal owner" of the subject property or, if a corporation owns the property, an officer of that corporation. While that may be the law in other jurisdictions, that is not the law in the District of Columbia.

At the time in question, the District of Columbia Municipal Regulations provided that:

7

> *The owner* of any residential premises in which there resides a child under the age
> of eight (8) years ... shall maintain the interior and exterior surfaces of the
> residential premises free of lead or lead in its compounds in any quantity
> exceeding five-tenths (0.5) of one percent (1%) of the total weight of the material
> or more than seven-tenths of a milligram per square centimeter (0.7 mg/cm 2), or
> in any quantity sufficient to constitute a hazard to the health of any resident of the
> residential premises or any regular visitor to the residential premises who spends a
> substantial portion of his or her time in the residential premises.

D.C. Mun. Regs., tit. 14, § 707.3 (emphasis added).[6]  The Regulations define owner

"expansively," *see Childs*, 882 A.2d at 234 n.10, to include not only legal owners but also "any

person who, alone or jointly or severally with others, . . . [h]as charge, care, or control of any

building arranged, designed or used (in whole or in part) to house one or more habitations, as

owner or agent of the owner. . . ." *Id.* § 199.[7]

---

[6]The section has been amended to read as follows:

The owner of any residential premises in which there resides a child under the age
of 8 years or to which a child under the age of 8 years is a regular visitor who
spends a substantial portion of his or her time in the premises, shall maintain the
interior and exterior surfaces of the residential premises free of lead-based paint
hazards as defined by the United States Environmental Protection Agency in 40
C.F.R. § 745.65(a) through (c)).

D.C. Act 15-769, 52 D.C.Reg. 2627 (Mar. 18, 2005).

[7]In full, the regulations define an "owner" as:

- any person who, alone or jointly or severally with others, meets either of the
following criteria:

(a) Has legal title to any building arranged, designed, or used (in
whole or in part) to house one or more habitations; or

(b) Has *charge, care, or control* of any building arranged, designed
or used (in whole or in part) to house one or more habitations, as
owner or agent of the owner, or as a fiduciary of the estate of the
owner or any officer appointed by the court.  Any persons
representing the actual owner shall be bound to comply with the

Thus, a number of individuals who are neither the "legal owners" of an apartment building nor officers of a corporation that is the legal owner are covered by the District of Columbia's lead paint regulations. *See*, *e.g.*, *Childs*, 882 A.2d at 233-37.   In addition, as long as the "owner" had constructive knowledge that a child under the age of eight resided in the apartment, a violation of the lead paint regulations constitutes negligence or negligence *per se*. *See id*.[8]  As the court in *Childs* explained:

> In § 707.3, we have before us a particular Housing Regulation that is designed to protect public safety and that requires landlords to be proactive when its specified preconditions are satisfied.   Upon notification that the prospective tenants of [the apartment] would include children under eight years of age, § 707.3 imposed a specific, affirmative duty on the owners and their agents to provide those premises to the [tenants] in a lead-free condition or not at all.  Although the [owners] and their management company may not have known there was lead paint in the premises, "actual knowledge [of the defect] is not required for liability;  it is enough if, in the exercise of reasonable care, [the "owners"] should have known that the condition ... violated the standards of the Housing Code." *Whetzel*, 108 U.S.App. D.C. at 393, 282 F.2d at 951.  "Ordinarily, the landlord will be chargeable with notice of conditions which existed prior to the time that the tenant takes possession," RESTATEMENT § 17.6 cmt. c, and the creation in § 707.3 of

---

> terms of this subtitle, and any notice or rules and regulations issued pursuant to this subtitle, to the same extent as if he or she were the owner.

D.C. Mun. Regs., tit. 14, § 199 (emphasis added).

[8]As the court in *Childs* explained:

> The general rule in this jurisdiction is that where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law.

882 A.2d at 235.

an affirmative duty to furnish lead-free premises implies a concomitant, antecedent duty to ascertain whether the premises in fact are lead-free. In effect, § 707.3 presumptively serves to put the landlord on constructive notice of any lead paint hazard in premises occupied by children under eight. *See Juarez*, 649 N.Y.S.2d 115, 672 N.E.2d at 137 (holding that under a New York City lead abatement provision similar to § 707.3, a landlord who has actual or constructive notice that a child under seven years of age is residing in one of its apartment units "is chargeable with notice of any hazardous lead condition in that unit," and therefore is liable for damages in the event the child suffers lead poisoning from exposure to that condition).

*Childs*, 882 A.2d at 235-37 (internal footnotes omitted). Thus, an individual need not be the

"legal owner" of an apartment building nor an officer of the corporation that is the legal owner to

be found liable for negligence or negligence per se whenever an apartment that is not lead-free is

inhabited by a child under the age of eight.

Here, the complaint alleges and the undisputed facts establish that both Marshall and Petri

qualify as "owners" under the D.C. Municipal Regulations. Marshall, as the President, sole

owner, and only "real" person behind Frederick Investment Corporation, and Petri, as the general

manager and only salaried employee of One Management, the property management company,

each had "charge, care, or control of [the] building . . . as . . . [an] agent of the owner." And, as

noted above, the present record, drawing all inferences in the plaintiffs' favor, requires the Court

to assume that both Marshall and Petri knew that the apartment was occupied by a child under

the age of eight.[9] Accordingly, both Marshall and Petri are potentially liable for Sakelia's lead-

paint poisoning irrespective of any personal liability they might also face based on their positions

---

[9]Nor do Marshall or Petri argue that as a matter of law either "demonstrated that the alleged violation of a regulation designed to promote public safety was 'excusable under the circumstances or [that] other acts of due care negate the negligence implied by the statutory violation" or that they "did everything a reasonably prudent person would have done to comply with § 707.3." *See Childs*, 882 A.2d at 237 (internal citations omitted).

as officers of Frederick Investment Corporation.

**B.      Should the Claims Against Marshall and Petri As Officers of Frederick Investment Corporation Survive Summary Judgment?**

Marshall and Petri argue that they cannot be held personally liable as officers of Frederick Investment Corporation for any of the torts alleged against it.  The parties agree, and law is well-established, that even absent grounds to pierce the corporate veil, "[c]orporate officers 'are personally liable for torts which they commit, participate in, or inspire, even though the acts are performed in the name of the corporation.'"[10]  *Lawlor v. District of Columbia*, 758 A.2d 964, 974 (D.C. 2000) (quoting *Vuitch v. Furr*, 482 A.2d 811, 821 (D.C. 1984)); *see also Childs v. Purll*, 882 A.2d 227, 239 (D.C. 2005); *Camacho v. 1440 Rhode Island Ave. Corp.*, 620 A.2d 242, 246 (D.C. 1993); *Snow v. Capitol Terrace, Inc.*, 602 A.2d 121, 127 (D.C. 1992).  "In other words, corporate officers, charged in law with affirmative official responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval."  *Vuitch*, 482 A.2d at 821 (internal quotations omitted); *see also Childs*, 882 A.2d at 239.  However, "[a]n officer's liability is not based merely on the officer's position in the corporation; it is based on the officer's behavior and whether that behavior indicates that the tortious conduct was done within the officer's area of affirmative official responsibility and with the officer's consent or approval.  Liability must be premised upon a corporate officer's meaningful participation in the wrongful acts."  *Lawlor*, 758

---

[10]The parties agree that District of Columbia law applies.

11

A.2d 964, 977 (D.C. 2000).  "Sufficient [meaningful] participation can exist when there is an *act or omission* by the officer which logically leads to the inference that he had a share in the wrongful acts of the corporation which constitute the offense."  *Id*. (emphasis added) (quoting *Vuitch*); *see also Childs*, 882 A.2d at 239.

The complaint alleges that both Marshall and Petri are liable as officers of Frederick Investment Corporation because each "participate[d] in, inspire[d], and/or induce[d] the tortious acts or omissions complained of herein."  Compl.  ¶¶ 45, 87.  Both Marshall and Petri argue that they are not liable as officers because "there is no genuine issue of material fact that either [of them] personally committed, participated in, or inspired any of the alleged tortious actions of defendant Frederick Investment Corporation."  Defs. Mem. at 6.  They make two specific arguments.[11]  They first argue, citing *Lawlor*, that "[i]t is difficult, if not impossible, to demonstrate 'meaningful participation' in omissions or inaction" of a corporation such as the complaint alleges against Frederick Investment Corporation.  Defs. Mem. at 10.  Second, again citing *Lawlor*, they argue that even if it is not impossible to demonstrate meaningful participation in omissions or inaction, "for purposes of imposing personal liability on corporate officers for a failure to act, <u>actual</u> knowledge [of a dangerous condition] is needed,"  Defs. Mem. at 12, and there is no evidence that either had actual knowledge of the lead hazard at the Clifton Street Apartment.

**1.     Does *Lawlor* Preclude Corporate Officer Liability for a Corporation's Tortious Inaction?**

Marshall and Petri contend, unpersuasively, that *Lawlor* stands for the proposition that it

---

[11]Marshall and Petri jointly filed their motion for summary judgment and rely on identical arguments to challenge their liability as corporate officers.

is difficult, if not impossible, to impose corporate officer liability based on an officer's "meaningful participation" in a corporation's omissions or inaction.   In *Lawlor*, the employees of a nursing home brought an action to recover unpaid wages and benefits.   They sued the private corporation that had been awarded the contract to manage a city-owned nursing home, Urban Shelters, a related "shell" corporation that paid the employees during a time of financial crisis, Valrob, and three corporate officers, Roy Littlejohn, his wife, Marilyn, and his daughter, Robin. The trial court concluded that all three were personally liable as corporate officers – Roy and Marilyn as officers of Urban Shelters and Robin as an officer of Valrob.   The court held Roy liable based on its findings that he: (1) "either owned or exercised managerial control over" the corporation; (2) "was the sole stockholder" of Urban Shelters; (3) "served as president of Urban Shelters and as a member of its Board of Directors"; (4) "dominated the decision-making" for Urban Shelters; and (5) "participated, encouraged, and ultimately decided to convert the funds of the employees without their authorization to use for his own personal gain."   *Id.* at 972.   The court held Robin liable as the President of Valrob "based on the fact that she signed the checks at issue [and] managed the accounts," even though she took her orders directly from Roy and "testifie[d] that she kn[ew] very little as to why she was writing checks, what the transferred funds [were] for, where the money came from, or where it went."   The court held Marilyn liable as the Secretary/Treasurer of Urban Shelters, despite the lack of any evidence that she was "personally involved in any of the decisions or actions now at issue," because "as treasurer . . . the court must infer that [she] knows what is going on with the financial transactions of the corporation, and that as treasurer, she either supported, encouraged, or at least allowed, the improper transactions" and, therefore, "as a corporate officer, she shared responsibility for the

gross misuse of the corporate form and corporate assets described herein." *Id.* at 972-73, 977.

On appeal, the Court of Appeals for the District of Columbia affirmed corporate officer liability for Roy and Robin, but reversed it for Marilyn.  In affirming the trial court's decision that Roy was personally liable as a corporate officer, the court emphasized that "[i]t is essentially undisputed that [the defendant] dominated the [corporation] and used his authority to engineer the actions which generated [the Corporation's] tax liabilities and caused the corporation to become unable to compensate its employees." *Id.* at 976.  As for Robin, the court held that she could "properly be held personally liable" based on the trial court's findings that she "was actively involved, albeit at her father's direction, with the movement of funds between [two corporations] in order to shelter money owed to the IRS." *Id.* at 977.   With respect to Marilyn, however, the court concluded that the trial court had erred because there was

> nothing in the record to establish, or even to suggest, that [she] had anything to do
> with the conduct that led to the imposition of liability against her husband and
> daughter.  The plaintiffs offered no evidence that [she] had any knowledge of or
> involvement in the financial affairs of the corporations.  We are aware of no
> authority for the proposition that failure to prevent wrongful conduct committed
> by one corporate officer automatically imposes liability upon all other corporate
> officers.  Although liability may in some circumstances be based upon a corporate
> officers' failure to act to prevent a wrong, the plaintiff must show that the officer's
> omission bears some relationship to that wrong, e.g., proof that a corporate officer
> was aware of a dangerous situation and nevertheless permitted reasonable
> preventable harm to occur.

*Id.* at 977.

Marshall and Petri argue that the court's reversal of liability for Marilyn establishes that it is virtually impossible to impose corporate officer liability for a corporation's tortious omissions. However, *Lawlor* says nothing of the kind.  The court in *Lawlor* only addressed whether and under what circumstances one corporate officer's failure to prevent another corporate officer's

14

wrongdoing could be a basis for liability.  Its reversal of liability for Marilyn was based on its

determination that her failure to act to prevent corporate wrongdoing *by other officers* in the

absence of any evidence that she "had any knowledge of or involvement in the financial affairs of

the corporations" – the arena where the wrongdoing occurred – was not sufficient to impose

corporate officer liability.  The issue of a corporate officer's liability for a corporation's tortious

omissions or inaction was not before the court and was not discussed.  Thus, the decision in

*Lawlor* does not stand for the proposition that it is virtually impossible to impose corporate

officer liability for a corporation's omissions or inactions.[12]

> **2.  After *Lawlor*, is a corporate officer only liable for his inaction if he or she was aware of a dangerous situation and failed to rectify it?**

Marshall and Petri's second argument also relies on the *Lawlor* court's analysis of

Marilyn's liability.  They contend that the court "*held* that imposing personal liability based on

a[] [corporate officer's] omission requires establishing that the officer was *aware* of a dangerous

situation and did not rectify it."  Defs. Mem. at 12 (emphasis added).  Thus, they argue, in order

for them to be liable for the plaintiffs' injuries they must have had "actual knowledge of the lead

hazards being present in the Clifton Terrace Apartments."  Defs. Mem. at 11.

Again, Marshall and Petri's reading of *Lawlor* is not persuasive.  The precise language at

issue is the court's statement in *Lawlor* that:  "Although liability may in some circumstances be

based upon a corporate officer's failure to act to prevent a wrong, the plaintiff must show that the

---

[12]The plaintiffs' response to this argument is that *Lawlor* expressly states that a corporate officer's "meaningful participation" can be shown through a corporate officer's "acts or omissions."  The plaintiff's response, while an accurate statement of *Lawlor*, does not directly address Marshall's argument that it is difficult, if not impossible, to show corporate officer liability for a corporation's omissions.

officer's omission bears some relationship to that wrong, *e.g.* proof that a corporate officer was aware of a dangerous situation and nevertheless permitted reasonably preventable harm to occur." Marshall and Petri contend that what the court meant by this statement is that the only way that a corporate officer can be held liable based on an omission is if the officer is aware of a dangerous situation and fails to rectify it. However, not only does the pertinent language appear following an "e.g." – as an "example" – but in *Lawlor* itself there was no dangerous situation, merely financial wrongdoing. Thus, in referring to a corporate officer's failure to rectify a dangerous situation of which he was aware, the court in *Lawlor* was only giving an example, not delineating the outer bounds of corporate officer liability. Accordingly, there is nothing in *Lawlor* that requires the plaintiffs to prove that Marshall or Petri had actual knowledge of the lead hazard at the Clifton Terrace Apartment in order for them to be found liable for the tortious omissions of Frederick Investment Corporation.

Indeed, in *Childs*, the District of Columbia Court of Appeals expressly held that a corporate officer could be found liable for failure to rent an apartment in a lead-free condition even though he "never inspected or even visited [the plaintiffs'] apartment during the term of their lease, [was] not directly involved in the management of the property during th[e] [relevant] period of time, and [was] not aware that a lead paint hazard existed on the premises." 882 A.2d 227, 240. As the court in *Childs* explained, the corporate officers' "alleged negligence essentially was in allowing their company to rent an apartment with lead-based paint to [the plaintiffs] in violation of the Housing Regulations and without warning [the plaintiffs] of the lead poisoning danger to which they were exposed." *Id*. at 240. With respect to the corporate officers' liability for such negligence, the court expressly held that they "were not entitled to

16

summary judgment based on their lack of notice of a lead paint hazard in appellants' apartment, because the defendants were on notice that children under eight years of age would be occupying the apartment, and the Housing Regulations impose an affirmative obligation on landlords to maintain lead-free premises where such children reside." *Id.* at 237.

In light of the court's decision in *Childs*, it is clear that Marshall and Petri's claimed lack of actual knowledge of the lead hazard at the Clifton Terrace Apartments is not dispositive of the issue of their liability. They are both chargeable with knowledge of the D.C. Housing Code. And, as discussed above, the record requires the inference that a jury could find that Marshall and Petri knew that a child under the age of eight resided at the Clifton Street Apartment. Assuming, as the court must at this stage of the proceedings, that a jury could find Frederick Investment Corporation liable for failing the ensure that the apartment rented to the plaintiffs was lead-free, the only question is whether the evidence, viewed in the light most favorable to the plaintiffs, could support a jury finding that Marshall and/or Petri meaningfully participated in the tortious conduct of that corporation.

The plaintiffs contend that Marshall's "meaninful participation" is shown by his deliberate failure to properly supervise the agents managing the property to ensure that they were managing it so as to be in compliance with the D.C. Housing Code and free of lead paint. Given Marshall's status as the only "real" person behind any and all of the allegedly tortious actions or omissions of Frederick Investment Corporation, his alleged failure to properly supervise the agents managing the property could be found by a trier of fact to constitute "meaningful participation" in the alleged wrongs of the corporation.

The question of Petri's potential liability is arguably different because of her "minimal"

17

role as an officer of Frederick Investment Corporation.  However, it is also undisputed that Petri

alone ran One Management, the property management company for the Clifton Street Apartment

Building, was responsible for hiring the on-site personnel, was responsible for overseeing the on-

site personnel (although she in fact exercised very little oversight), and, in her capacity as the

general manager of One Management,  was in a position to ensure that the Clifton Street

Apartment was lead-free.  Thus, unlike Marilyn in the *Lawlor* case, Petri was both an officer of

the defendant corporation and had an affirmative responsibility that she allegedly failed to carry

out – properly managing the Clifton Street Apartment Building.  The fact that this responsibility

arose from her position in One Management does not mean that it has no bearing on the question

of whether she "meaningfully participated" in the allegedly tortious conduct of Frederick

Investment Corporation.  The court is persuaded that a trier of fact could fairly conclude that

Petri's failure to properly supervise the on-site personnel at the Clifton Street Apartment

Building – even though her obligation to do so technically arose from her position as the general

manager of One Management –  constituted "meaningful participation" in the allegedly tortious

conduct of Frederick Investment Corporation.

## C.    Punitive Damages

Marshall and Petri also seek dismissal of the plaintiffs' claims for punitive damages on

the ground that "[t]here are no actual facts that would even remotely support the egregious type

of conduct required to make out a prima facie case for punitive damages."  Defs. Mem. at 13.

Under District of Columbia law, a plaintiff must be able to prove "outrageous conduct which is

malicious, wanton, reckless, or in willful disregard for another's rights."  *See Tolson v. District of*

*Columbia*, 860 A.2d 336, 345 (D.C. 2004).  The plaintiffs' allegations, if true, describe the type

of conduct that a jury could decide warrants punitive damages.  Accordingly, Marshall and Petri are not entitled to summary judgment on the punitive damages claims against them.

### III.  CONCLUSION

For the reasons stated above, an accompanying order denies the pending summary judgment motion.

/s/

Dated: September 12, 2007          Louis F. Oberdorfer
                                   UNITED STATES DISTRICT JUDGE